Our second and last case this morning is number 14-1047, Hitachi Consumer Electronics v. Top Victory Electronics. Ms. Maynard. Thank you, Judge. May I speak to the court? Yes. My name is Deanne Maynard and I represent Hitachi. The judgments of invalidity and non-infringement should be set aside and this case should be remanded for a damages trial. TPD's invalidity case hinged on a single document, the DigiCypher document, that is not prior art and its non-infringement defense turned entirely on limitations that are not part of the claim. That is not enough to sustain the verdict. At the very least, Hitachi is entitled to a trial not painted by the DigiCypher document. I'd like to start first with invalidity. There is not sufficient evidence and certainly not evidence that a jury could find by clear and convincing evidence that the DigiCypher document was publicly available before the priority date. The document is dated only several weeks. There is testimony by your own expert, as I understand it, at 8822 of the record, that this document was submitted to the FCC before the critical date. Right? Wasn't the jury entitled to believe that? That testimony, I do not think that's fair reading of, you're talking about Mr. Hamilton's testimony, Your Honor? No, it's, what is his name? What page were you? 8822. It's your expert. 88… Leary or whatever his name is. Scott Leary. Scott Leary, Your Honor, is not our expert. Scott Leary was their witness that they called as a fact witness. He used to work at General Instrument. He worked at General Instrument in June of 1999. Put aside my characterization of it. Why isn't Mr. Leary's testimony there sufficient to allow the jury to conclude that this was submitted to the FCC before the critical date? Because he testified only that it was submitted to the government agency at some point in time. But he did not know when. He did not know when. In fact, he testified on this very page. I don't know when this document was given to the public. I just know that it was readily available to anyone at GI. So General Instrument is the company at which he works. And so, yes, a jury could infer that this document was internally available at General Instrument. He did testify somewhere that whenever he started at GI in June, he testified that he understood that the document DigiCypher had been submitted to the FCC. He said that somewhere in the testimony. I think you have to acknowledge that. He testified only that this document was known. This is on the page Judge Steik is citing, A8822. This document was known by certainly the government agents that this was submitted to, the public agency it was submitted to. But he gives no date, no date for that. Even if you would allow an inference, which I don't think you can, but even if you would allow an inference. I think I've pointed you to the wrong testimony, so let's start again. It's A8333 and 34. And this, I think, is your expert. This is where the testimony exists that it was given to the FCC before the first week, about the first week of June in 1990. This testimony, they're playing, if I'm in the right place, they're playing a deposition from some other trial. And the expert actually denies that it means what PPV is trying to make it mean. But on the face of it, he says it was submitted to the FCC before the critical date, right? It says the San Diego division had presented a proponent system to the FCC. So two points, Your Honor. One, the witness says no, I don't think so, and I haven't seen anything that tells me that. Okay, so he denies it. But even if you would allow the question to be taken for what it says, it says only that some digit cipher system was presented to the FCC. And under this court's case law, particularly Norian Stryker, a presentation without knowing whether the anticipatory document, the only thing they have here that actually, that they have a claim to anticipate is the digit cipher document itself. Okay, I guess what I'm trying to understand is, in some ways, if we take it on face value that GI made a presentation to FCC about the system, the digital digit cipher system, then that sort of lends even further credence that this was somehow publicly available. It was known to interested members of the public, because I think we have to acknowledge the working party of the FCC on this issue were interested members of the public. Well, two things, Judge Chin. One, at most you can get from this that it was submitted to the FCC. The fact that there was a presentation made to the FCC. There's no evidence that the document itself, the anticipatory document, was given to anybody or to whom at the FCC it was given. So under Norian Stryker, a presentation alone without evidence that the document itself was given would not be enough. We also know that under this court's case law, submission to a government agency alone is not enough. I think I would agree with you there. There's a case listener that said that manuscript that was just filed at the Copyright Office by itself turned out to be not enough for publication or to be publicly known. But this witness used the word presented, which to me is not just, he didn't say filed or submitted, he said presented. And now we're starting to maybe get into a zone that's a little bit more like Klopfenstein or something like that, where now all of this information from a document is being presented to a group of interested people. Two points. If you look on A8333, so the premise of your question is wrong. What this testimony shows at best is that some cable system was presented to the FCC. That's not the DigiCypher digital TV broadcast system that is the anticipatory document. Well, that system is for both cable and broadcast, right? The DigiCypher document system. Yes, is for both cable and broadcast. I believe the document itself, Your Honor, just shows a broadcast system. What page is the DigiCypher document? The DigiCypher document is A16841. They have not made the argument that you're making, Judge Dyke. 16841? Yes, Your Honor. Does that mean the table of contents shows having three alternate media distribution, cable transmission, satellite transmission, other terrestrial distribution? The second point, though, that I would make, and I think this is important, which is that this is the lawyer speaking here. The witness denies it. The witness denies it. The witness says, no, I don't think so. So the question is, sir, when you joined GI in 1990, the first week of June in 1990, the San Diego division had presented a proponent system to the FCC. True. No, I don't think so. And I haven't seen anything that tells me that. So he is denying this testimony. But isn't the jury entitled to believe from his first statement that the system was presented, despite his later somewhat equivocal denials based on the fact that he was developing a cable system? I don't think that would be clear and convincing evidence that can invalidate this presumptively valid patent. No, Your Honor. And in fact, as I mentioned before, all it says is it was presented. It doesn't say that the document was given. And it's the document that is allegedly anticipatory. And in Nory and Stryker, the presentation was given, but there was no proof that the abstract had actually been handed out. It was the abstract that was anticipatory, and this Court affirmed the setting aside of a jury verdict based on that evidence, that this is very similar to that. Even if you assume there was some presentation made to the FCC, there's no evidence of who received the presentation. Judge Tanai, we don't know whether it was given to the working group. There's no testimony to that effect. There's no testimony who was on the working group that allegedly heard it. There's no testimony under what restrictions that working group was receiving information from other companies. There's no case of this Court upholding the invalidity of a patent based on such a thin record of something being prior art. The Cooper Cameron case on which they put heavy reliance is entirely different. There were nine companies, nine companies involved that had the document. The testimony was that they were expressly allowed to share the information and in fact had shared the information. Let's assume that we disagree with you for the moment. We conclude that this testimony would allow the jury to find that it was submitted to the FCC before the priority date, combining the Leary testimony and the other testimony. That the document was submitted, Your Honor. That the document was a presentation of that. Okay. Why and that it went to the advisory committee. Why wouldn't giving it to the advisory committee before the priority date be sufficient to constitute public knowledge? Because we have no evidence of who was on that advisory committee that supposedly could be inferred to have heard it. Under what restrictions they were hearing evidence from other companies, even if you assume the working group is made up of people from other companies. The sessions of the advisory committee are public, right? There's no evidence of that, Your Honor. No, but that's the way the FCC documents disclose that, right? I mean, there's no question that the advisory committee is a public body that conducts proceedings in public. There's no evidence of that in this record, Your Honor. Is there any question about it? This was their burden to prove by clear and convincing evidence. I understand what you're saying, but is it not the case that FCC advisory committees must conduct their proceedings in public? I do not know that standing here, and the jury was not given any evidence to believe that. So the question is whether there was evidence presented to the jury from which it could find by clear and convincing evidence that this document was available in the four or five short weeks between its date on it and when it's the priority date. And that's an extremely high burden, that it would be a leap upon leap upon leap upon leap of inference, even if you would grant them that that would be enough for a preponderance. It can't be enough for clear and convincing evidence that this was publicly available, which this court applies the standard, readily available to a certain segment of the interested public. And it's a big stretch from this one page of deposition from some other case that says table, that's denied by our witness. He doesn't say table in the deposition. That's his effort to explain it later on. He explains that it was about something different, and then he denies that his previous testimony shows that it was available. They're trying to take three I don't knows. I don't know from Leary about when it was available. I don't know from Hamilton about when it was available, and I don't know from Henderson about when it was available, and get an inference that it was available. And that's like taking a 0 plus 0 plus 0 and getting something, and it certainly can't be clear and convincing evidence that it was available. So I would like to talk about infringement, although I certainly for 375 and 310 need to set aside the invalid verdict. I can talk about the 243 first and then come back to the 375. We'll give it a couple minutes. Go ahead. The 243 verdict, they hinge, they're trying to affirm that based on the word and. We don't dispute that the district court claim construction is right. Video signal format means the number of scan lines and whether it's progressive or interlaced. But it's a video signal format. So 720i is a video signal format. And if you take that and process it through the scaler, if you take 720i and you process it through the interlacer and you get 720p, that's a different video signal format. So your theory is that any combination of processors that do both of these things would satisfy the claim, right? Our theory is that, I'm not sure exactly of your question, but our theory is that 720i is a video signal format. Well, the format is, both of these things have to be done, right? The interlacing and the number of lines. And what you're saying is it doesn't have to be done by a single processor, it could be done by different ones. It doesn't have to be done by single, it doesn't always have to be done on every, both of them don't always have to be done, but a product can do both either, right? There's a plurality of processors is our theory. One is the deinterlacer and one is the scaler. Well, if you thought that, why didn't you ask for a claim construction? We agree with the claim construction, Your Honor. No, but the claim construction doesn't address this question. That's why we have a problem here, right? Well, but they're trying to read the word according to and an, not according to their natural meanings. I mean, everyone agrees that a video signal format is not the letter… No, but there… Try to address the question. You could have asked for a claim construction in advance that resolved this, and you didn't, right? Well, to be fair, we didn't know this was their argument. I mean, they made a different argument at claim construction, which the judge rejected. Well, you could have asked for a supplemental claim construction, right? That happened. But it's not really a claim construction issue because we agree with the claim construction. I mean, they're just, a video signal format does mean the letter and the number, but it's processing according to the letter and the number to take 720i and process it and come up with a different video signal format, 720p. So video signal format is like the AB. And so when you take one… 720i is a different video signal format than 720p. If that is the plain meaning of that claim, we don't need a claim construction. If you take a 720p and you convert it to a 1080p, that's one video signal format being scaled, processing, which they agree is processing, and out comes a different video signal processing. That's processing according to a different video signal. It meets the claim. We don't need another construction. We're trying to enforce the district court's construction. It's just like MOBA. And in the same situation… But MOBA turned on the court's conclusion that as to the point at issue, there was genuinely no uncertainty about the meaning of the claim construction that was given to the jury and so on. And once you had absolutely no uncertainty about it, you also concluded that the only way that could be avoided was by coming to a different view than you're just enforcing the indisputable meaning of the claim construction. The problem here is that the claim construction that went to the jury that you left unchallenged, I guess the argument is the conclusion below was it's just not that clear. You could read the and in a couple of different ways, and unless you clarified it, then one of the reasonable ways to read it is the way the expert did. But it's processing. I just disagree that it could be reasonably read that way. Processing according to a different video signal format, with different video signal format always being A and B. They agree that 720i is a video signal format. Their expert agrees that 720p is a different video signal format. They agree that processing is occurring when the deinterlacing occurs on that video signal format. So it's processing according to a format, 720i, and it's coming out with a different video signal format. Thank you, Ms. Maynard. We'll give you two minutes. Thank you, Judge Feist. Mr. Hacker. Good morning, Your Honors. May it please the Court. I'm John Hacker, counsel for Top Victory. I think the argument we just heard explains and establishes that cases like this one are the reason that juries exist. Every issue Hitachi now raises on appeal was a factual issue Hitachi raised before the jury. On DigiCypher, the generalities don't help me at least, so I'm not really interested only in what the evidence says. DigiCypher, what is the best evidence you have for the proposition that the DigiCypher document was given to the FCC, and I will include in that the advisory committee, in June of whatever the relevant year was? It starts with the context. I mean, I agree with the questions of the Court that both Leary and Hamilton established that it was given to the FCC, but you have to start before that, which is the context, which this was a response to, and the evidence shows that this was a response to an invitation by the FCC from interested members of the public, i.e., industry participants, to come up with a common standard, a common broadcast standard for high-definition television. That's what was going on. I understand GI was in a proselytizing mode, but can you just point to me, you indicated that Leary testified that it had gotten to the FCC when he got the GI, or something like that. So what's the page for that? The page is at 8818, that's my note, I hope that's right. And that's the exact page that Hitachi relies on to say that he doesn't identify the specific date, and of course what's going on there is he's saying, I don't know what you mean by publicly known. No, that's the 8822 stuff. Okay, I'm sorry, that's 8822. So I'm looking at that page, and I'm looking, where in those words does it say or suggest, he says, I don't know the exact date, and there's a difference between I don't know the exact date, but I know some range. I remember your position being the range is sufficiently attested to or implied by when I got there. Where's the where, when I got there? It's the context of what he's talking about, and that's why you start with 8818 and read it the whole through. He's being queried about the time that he got there, and they want to know, the counsel cross-examining wants to know exactly what the date is, and his point is, he's talking about the whole context of the cross-examination, and that's why we have juries look at witnesses and hear examinations, rather than try to do it on a cold record. The whole context is, when I got there, GI was excited about it, everybody was talking about it, press releases were handed to me, and then he says in response, the agency had a copy of it. His whole point is, when I got there, that's what was going on. When he got there, the agency had a copy of it? I believe that's on 8822. The agency had a copy of it. That's, again, in response to this point, when he's trying to be pinned down on the precise minute or hour or day that it was handed to the agency. He says, essentially, I don't know what you mean by public knowledge. That's a legal term of art. All I know is everybody was talking about it, the agency had a copy of it, and he's talking about the period that he got there. But, again, the same is true. It's not just Mr. Leary, it's Mr. Hamilton, who does say, absolutely, in the prior case that DigiCypher was given, a digital system was given to the FCC about when he got there, which is on June 4th, and that passage is 8333. He does try to get out of that by saying, well, I was remembering a cable proposal. The DigiCypher is a cable proposal. It says so on the very first page in the introduction. Part of what was discussed earlier was how I think the argument was made that the language that that expert used talked about a presentation of the system to the FCC, and there's a gap between that and the giving of the specific document. What supports the proposition that the document was given to the FCC? Well, I think there you look at the document itself. It says submitted by, with a particular date on it, and when you look at the document, it's clearly a formal presentation to be submitted to somebody, and the only body that anybody would be submitting something like this to is the FCC in response to the FCC's invitation to make submissions for a broadcast standard, which is exactly what this is. And do I remember right, you have some point about how this was submitted basically at 11.50 in the evening before the deadline? Exactly. The FCC, I don't have the record citation for that, but that's exactly what happened. There was a deadline for submissions by members of industry. You don't have a record citation standing here. Was there evidence of that, or is that something you? I will only tell you I believe there was evidence of that, that there was a deadline, that they were meeting the deadline, that the deadline was June of 1990 for participants in the industry to submit their proposals for a common standard to be shared by everybody, the whole point of which was to urge the FCC working group and interested members of the public to adopt this standard. And they made this submission for the purpose of persuading the FCC, the working group, to adopt this standard and not some other standard. But I want to back up if I can just briefly to the legal standard, because I think there may be a bit of a disconnect. The press release, which is in the record, but I guess wasn't in evidence, says that it was submitted before the priority date, doesn't it? Yes. I do want to back up just briefly to the legal standard that's at issue, because the question here is whether it's available to members of the public interested in the art exercising reasonable diligence. Now remember the statutory language itself just says it has to be known or used by others. And the standard, as it's been, the gloss that's been put on it by this court and others has been that it's not enough just to be known by others, but it also has to be known by others who are under no obligation of secrecy. It's based on the twin policies of the patent law. One is novelty, and so if it's known by others, it's not novel. And as Justice Holmes said in Alexander Milburn, you could stop there in theory. You could stop there and say as long as it's known by others, you don't get a patent. And here obviously it's known by others. It's known by general instrument who invented it first. But, as Justice Holmes said and the cases have said, it's not enough that it's known by others, those at GI, it has to be known by others who are under no obligation of secrecy because that's the other policy of the patent law, which is disclosure. So if somebody else came up with it first, but then held it secret and didn't want to share it with the public, then we'll say to the second inventor, we'll reward you with a patent because you are willing to disclose it to the public. So that's what comes down to the actual standard. The way known by others is played out in the case law is to say the inquiry is whether or not it's known by others interested in the art who did not seek to conceal it, who didn't take affirmative steps to conceal it. So that's the question that the jury had to consider here. Is there a case law about whether in this particular issue, as on some, there's kind of a ping pong-y burden of production or proof? There's been a lot of case law applying this standard of what it means to be known to others interested in the art who exercise reasonable diligence and whether or not it's sufficient when it's known to others who didn't act to conceal it. A number of the court cases, Cooper Cameron is an example, on both sides of it. So you have cases like Northern Telecom. What they're looking for, when it's established, that somebody else knew it first as it is established here, as it's conceded here. What the cases look for was some reason to think that the others who knew it were trying to keep it secret. That's why you see so much discussion of whether or not another company was keeping something confidential, with a stamp of confidentiality. I think you need something more than just having a single company with a series of employees that happen to have some knowledge and that no one is saying it must be kept confidential and then that by itself should be considered publicly known. There's no case that falls that way, right? Well, it's not clear. What you're looking for in the cases is whether or not,  could obtain the information through reasonable diligence. And the cases answer that by looking at the other folks who had it. The other company, the other joint venture who had it. Were they trying to keep it confidential? Because if they weren't, and it was otherwise publicly out there, i.e. was it publicized in press releases, etc. If they weren't trying to keep it confidential, and indeed were publicizing it, as was true here, then you know, and there's reasons how to define that. Well, as the promotional material suggests, please come to GI and hear us talk to you about the DigiCypher. With respect, Your Honor, that's why I wanted to start with the context. The whole point of this, from start to finish, was to propose a standard to convince the public to adopt the DigiCypher standard. And so when they tout the standard in press releases, when Hamilton comes to the company being aware of the DigiCypher standard, a public standard to be submitted to a public body, there absolutely was a basis for the jury to infer that anybody like Hamilton, somebody outside GI, who wanted to know, I hear you're proposing a dramatic new all-digital standard that's going to change the world. And that's what you want me, as an interested member of the public, to adopt. What does that standard look like? If you're trying to get somebody to adopt the standard you're proposing, of course you're going to disclose it to them if they ask. So the idea is that the press releases were an invitation from the public to get this if they wanted it? The point is they were telling the public where they could find the information if they were an interested member. In the press release? Well, the press releases aren't in the record, so I'm not relying on the press release. The content of the press release is not in the record, but there is reference to making the press release about the DigiCypher document. What the press releases essentially were doing was sending out a klaxon that this is the place to come. This is where we have come up with a proposed standard. You can't very well argue that the mere fact that a document existed within the files of a company made it known to the public. That seems to be an impossible position. There has to be something that invited the public and made it available to the public if they wanted it. And what I'm asking you is are you saying the press releases constituted that invitation? At least. And the fact that Hamilton, who was outside the company when he joined GI, was aware of the DigiCypher, that tells you that the press releases worked, that they were doing what the company intended when it made this path-breaking proposal to the FCC, and by to the FCC I actually mean to other industry participants who they were trying to persuade to adopt this standard. It's not like those press releases and the knowledge confessed by Hamilton and established by Leary about their awareness of the DigiCypher system is what distinguishes this from other kinds of cases where you're exactly right, Your Honor, there's a document that's secreted in a company's files or nobody bothers to do anything about it. And there's no way. The key inquiry is... Where can I find the content of your press releases that you're suggesting is attracting interested members of the public to come flocking to GI? The press releases aren't in the record, but I'm telling you that when Leary... They're in the appendix, aren't they? Yeah, they're in the appendix. The court can look at them. I'm just saying the jury didn't rely on them because they weren't given to the jury. What the jury relied on was Leary saying he was handed a press release that was touting it. They're relying on Hamilton who said when he showed up at GI he was already aware of the DigiCypher system. These were employees, right?  They became employees, but when they arrived... After they became employees. They were aware of it before they were employees. Hamilton was aware before he was an employee. Right, but that's not enough to suggest that they were just interested members of the public that came knocking on GI's door to find out more about the DigiCypher system. I think what it establishes is that this was not like a grad student who comes up with a proposal and puts it in his thesis and it gets filed away in a library. This shows that DigiCypher... Excuse me, that GI was telling the world members of the interested public, we have a system, we want you to adopt it. The jury from that was entitled in a context where the whole point was to get the interested public to join. What if we conclude that it all boils down to whether the document really was submitted to the FCC before the priority date and that it was accessed by the working party before the priority date? Where's the best evidence on that? Well, the working party, I think it's agreed, include members of the interested public. And so the question is whether the jury can infer from all of the evidence I'm talking about that the document was submitted and available to the working party before the priority date. And there's no contrary evidence to that. The whole point was, the only reason this was submitted was so that the working party could review it. So I guess you're saying you don't feel like you have to rely on an actual presentation to the working party was necessary before the priority date. All that matters is as long as the document was in the hands of the FCC, it was immediately somehow readily available to the members of the working party, and that alone did not trigger it to become either a printed publication or publicly known. Well, to be clear, Your Honor, I don't want to leave the impression that our whole case comes down to one point or another. It comes down to the entire panoply of evidence before the jury. And the jury was asking whether or not knowledge in the possession of general instruments, those are the others. Remember, the others already knew it. That's conceded. So the question is whether the knowledge they had was publicly available to those interested in that knowledge. And that's why we don't have to establish that the FCC working group had it at a particular time because the knowledge that GI had, the document, the digitized system that GI had, the jury was easily entitled to infer that that was available to members of the interested public because they were publicizing it, because the whole point of the system was to persuade others to adopt it. This was not a secret hologram technology. I'm just saying hypothetically, what if I personally really care about the FCC question? And maybe that's all I care about. Maybe I think that the fact that some GI employees walking around inside the building knew about it isn't enough, and the fact that there was some promotional materials about the GI system wasn't enough. And now it really does come down to when it was submitted to the FCC and that it was accessible to the working party. I mean, just because a document is thrown into a federal agency doesn't mean it's automatically and immediately, on the day that it's submitted, whenever that day is, that it's automatically now accessible to members. Yeah, if this were Lister, the document goes into the Copyright Office, it's literally lost there. Nobody knows how to find it. That's why the context is so important for you, I think, to understand, which is the point was to give this to the FCC so that the working party committees would have it. That happened 40 days before the priority date. Right, right. And just regularity of process. There's no indication that the FCC has a document delay process. There's no reason to think it got lost in the hallways. The only reason this was submitted to the FCC, and Larry and Hamilton established that that happened early in June, was so that the working party members would have it so that they could make a decision about whether or not this should be the public standard. I guess let me ask it differently. In AA333, when Hamilton says the digital system is presented to the FCC in 1990, is it your understanding that he's referring to a presentation to the working party at the FCC? I think he's referring to this document, which says submitted by, which was presented to the FCC, to the working parties. So this is the presentation. Well, yeah, but presented to the FCC. What does that mean? Does that mean it was the document that was filed? It was mailed to the FCC? Or does it mean that there was a dog and pony show in front of the working party at the FCC where employees of GDI were running through the details of the digitized document? Which one is it? I think it's that this document was submitted to the FCC. That's the best inference you have from the fact that it says submitted by and has a June 8th date, and there's nobody else to which it would be submitted. There may also have been an oral presentation elaborating this, but we wouldn't have to establish that. The point is it was submitted on June 8th to the FCC for the purpose of review by the working parties, and so that's the presentation. Why wouldn't there be a Lister issue there, where in Lister there wasn't enough evidence, at least in that record, that it was actually accessible? Yes, the manuscript had been filed at that federal agency, but there was no evidence or not sufficient evidence to suggest that it was accessible by anybody who reasonably wanted to get their hands on it. Why all of a sudden is it a different situation here based on nothing more than testimony of a fair filing of the document? Because it's not based on just that fair fact. The facts are fundamentally different. In Lister it wasn't just the filing, it was the fact that it was filed and then misfiled basically, put in an index that nobody could find it, and the court said that's not sufficient evidence of public availability. Here it's not just a submission to the FCC, it's a submission to the FCC in response to an invitation to make proposals to the industry, make proposals to the members of the interested public for that purpose. If in Lister there had been an invitation by the PGA or the USGA to come up with new rules of golf and submit them to the Copyright Office, which was going to review all our new rules of golf, and one of them was submitted to the Copyright Office for that purpose, Lister would have been a different case. It would have been this case. In this case you have a submission in response to an invitation to make a public submission about a public standard. The whole point of which, again, was to persuade members of the interested public that this is the standard they should adopt. The jury, therefore, was absolutely entitled on that record to conclude as it did that this information was available not only known by others at GI, but was available to other members outside GI who were interested in this new all-digital proposal that GI was trying to persuade the interested public to adopt. That was the whole point, and that's the basis for a jury's inference that it was available to those interested in this new proposal. Thank you, Dr. Hacker. Okay. We have two minutes. Thank you, Judge Dyke. I think it's important to note that I believe the sites for which Mr. Virch TV can't come up with the evidence for are the press release contents of the press releases that are not admitted. That certainly can't be sufficient to sustain the verdict. They've not challenged the jury's judgment on the content of the press releases. Those are cited in footnote 1 on page 24 of their brief, but Judge Dyke, one of the facts to which you referred, the date by which submissions must be made, et cetera, I believe those are in those press releases which are not before the jury. Mr. Hamilton was... I'm sorry. So the sentence about getting the submission in at the 11th hour under some deadline, that's not actually supported by admitted evidence? I do not believe so, Your Honor. Secondly, Mr. Hamilton was inside. He was hired by General Instrument, although he was our expert at the trial. They were talking to him about time he spent at General Instrument. He testified that DigiCypher was thrown around at the company for many different systems. It was used to label many different things, and he denied that that testimony from the previous trial supported that the document was presented to the FCC by the critical date. There is absolutely no evidence in the record that anyone testified that the document was publicly available. The standard is known. Known. The general meaning of known is known by the relevant public. It's not knowledge by others. It's known by others, and this Court has consistently interpreted that to mean it must be available to the relevant public. Knowledge within the company is not enough. That's all Scott Leary testified to. That's all he testified to. The testimony where he says at some point the government agency had it is not tied at all on that page to when he started at the company. It would be a leap beyond imaginable to assume that and let the judge do it. That was in the beginning of redirect examination. Didn't the cross that immediately preceded it focus on what he knew as he came to the company so that it was inferrable that the context... I mean, I think it starts with redirect examination. You're right. It is the beginning of redirect, Judge Toronto, but I don't think that the cross turned on when he began at the company. The cross said you do not know when it was publicly available, and he said no. I don't think that the cross turned at all on when he started at the company, so I don't think it's a fair inference to infer that from the redirect. If this Court were to set aside the invalidity verdict, and I think at least we should be entitled to a new trial, but this is not enough evidence to sustain the verdict. It's against the clear weight of the verdict. We should be entitled to a new trial on invalidity. And as we set forth in our briefs, the non-infringement verdict turned entirely on limitations, not in the claims, and that, too, should be set aside. Okay. Thank you very much, Ms. Maynard. Thank you both. And the case is submitted, and that concludes our session for today. All rise.